## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LINDSAY FERRER, 610 Columbia Rd. NW, Washington, DC 20001, AMY HADDAD, 1398 Stratton Dr., Potomac, MD 20854, and SARAH SORSCHER, 623 Otis Place NW, Washington, DC 20010, on behalf of themselves and all others similarly situated, | No. 16-CV-2162 |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| CAREFIRST, INC.; GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC. d/b/a CAREFIRST BLUECROSS BLUESHIELD; CAREFIRST OF MARYLAND, INC., d/b/a CAREFIRST BLUECROSS BLUESHIELD; CARE FIRST BLUECROSS BLUESHIELD; and CAREFIRST BLUECHOICE, INC., | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiffs Lindsay Ferrer, Amy Haddad and Sarah Sorscher (collectively the "Plaintiffs"), on behalf of themselves and all others similarly situated persons ("Class", defined below), by and through undersigned counsel, bring this Class Action Complaint against CareFirst, Inc. ("CFI"), Group Hospitalization and Medical Services, Inc., d/b/a CareFirst BlueCross BlueShield ("GHMS"), CareFirst of Maryland, Inc., d/b/a CareFirst BlueCross BlueShield ("CFM"), CareFirst BlueCross BlueShield ("CareFirst BCBS"), and, CareFirst BlueChoice, Inc. ("CFBC") (collectively referred to as "CareFirst" or "Defendants"). Plaintiffs hereby allege upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation undertaken by their attorneys, as follows:

## SUMMARY OF THE CASE

1.      Defendants have wrongfully denied and continue to deny Plaintiffs and the members of the Class access to and coverage for a vital women's preventive service – breastfeeding support, supplies and counseling – which coverage is mandated by The Patient Protection and Affordable Care Act (the "ACA") (as amended by the Health Care and Education Reconciliation Act of 2010 ("HCERA") and other laws).

2.      A key directive of the ACA was that all individual and group health plans would provide access to and coverage for preventive health care benefits.[1]  As stated by the U.S. Department of Health & Human Services ("HHS"), prior the enactment of the ACA "too many Americans did not get the preventive care they need to stay healthy, avoid or delay the onset of disease, and reduce health care costs, [and,] [o]ften because of cost, Americans used preventive services at about half the recommended rate." *See* http://www.hhs.gov/healthcare/facts-and-features/fact-sheets/aca-rules-on-expanding-access-to-preventive-services-for-women/index.html (last visited 9/7/16).

3.      In addition to the policy of promoting preventive health benefits for all, the ACA specifically recognized the need to address the unique preventive health needs of women throughout their lives. *Id.*  Building upon the ACA's women's preventive health service mandate, on August 1, 2011 HHS adopted its Health Resources and Services Administration's ("HRSA") Health Plan Guidelines for Women's Preventive Services ("HHS Guidelines") which require access to and coverage for certain women's preventive services by most non-

---

[1] The only exception is health insurance plans that are grandfathered. To be classified as a "Grandfathered Plan" plans must have (1) been in existence prior to March 23, 2010; (2) refrained from making significant changes to the benefits or plan participants' costs since that time; and (3) had at least one person enrolled in the plan on March 23, 2010 and continually covered at least one individual since that date.  While there is no specific termination date for grandfathered status, it is expected that eventually all plans will lose their grandfathered status. As of 2014, only about a quarter of workers with employer sponsored coverage participated in Grandfathered Plans.

Grandfathered Health Plans starting with the first plan or policy year beginning on or after August 1, 2012.

4.      The HHS Guidelines, which were recommended by the independent Institute of Medicine ("IOM") and based on scientific evidence, ensure women's accessibility to a comprehensive set of preventive services, including health services related to breastfeeding support, supplies and counseling.  Under the HHS Guidelines, pregnant and postpartum women must have access to <u>comprehensive lactation support and counseling provided by a trained provider during pregnancy and/or in the postpartum period</u> ("Comprehensive Lactation Benefits"), as well as breastfeeding equipment. *See* HHS Guidelines, http://hrsa.gov/womensguidelines/ (last visited 9/21/2016).

5.      According to the Centers for Disease Control and Prevention ("CDC")*, "[b]reastfeeding, with its many known health benefits for infants, children, and mothers, is a key strategy to improve public health."* http://www.cdc.gov/breastfeeding/pdf/2016breastfeedingreportcard.pdf (emphasis added).

6.      While the protection, promotion and support of breastfeeding have been a national public policy for over 25 years, the CDC, the American Academy of Pediatrics and the enactment of the ACA with its Comprehensive Lactation Benefits coverage have brought breastfeeding to the forefront of women's health issues.

7.      As the then HHS Secretary Kathleen Sebelius announced in July 2012:

> Aug. 1, 2012 ushers in a new day for women's health when, for the first time ever, women will have access to eight new services at no out-of-pocket cost to keep them healthier…..This benefit will take effect for millions of adult and adolescent women over the course of the next year— and *it's just one of many benefits of the health care law that let women and their doctors, not insurance companies, make decisions about a woman's care*.
>
> …. *Instead of letting insurance companies decide what care women receive, the health care law requires insurers to cover these preventive services* in new plans beginning Aug. 1.

> …Women's health decisions shouldn't be made by politicians or insurance companies. Rather than wasting time refighting old political battles, this Administration is moving forward and ***putting women in control of their own health care***. If women are going to take care of their families and friends, they have to take care of themselves. The Affordable Care Act is making it easier for women to do that by making health care more accessible and affordable for millions of American women and families.

"Giving Women Control Over Their Health Care", *Posted* July 31, 2012, By Kathleen Sebelius, Secretary of Health and Human Services, http://wayback.archive-it.org/3909/20150925141312/http://www.hhs.gov/healthcare/facts/blog/2012/07/prevention073112.html (last visited 9-7-2016)(emphasis added).

8.    Contrary to the ACA, the HHS Guidelines, and Secretary Sebelius' expressed confidence that insurance companies could no longer dictate women's health decisions, Defendants are denying Plaintiffs and the members of the Class the ACA mandated access to and coverage for Comprehensive Lactation Benefits from trained providers for insured pregnant and postpartum women.

9.    Instead, Defendants (in their capacities as both insurers and third-party administrators of self-insured plans) have employed the following scheme to circumvent the ACA mandates:

(A)    Defendants do not establish a network of trained providers of Comprehensive Lactation Benefits.[2]

(B)    *Why?* If Defendants do not establish a network and women are not provided a network as part of their insurance plan, one of three things occurs:

---

[2]    Comprehensive Lactation Support is unlike other preventive services.  For example, prior to the ACA's enactment, medical services like a male prostate exam were conducted by and covered with a cost by a network of urologists.  After the ACA's enactment, such services were deemed preventive services that are covered at no cost when provided by the network of providers.  For Comprehensive Lactation Support, such services were not, prior to the ACA, covered health benefits and there were no established networks of trained providers.  Defendants failed to establish networks of trained providers in the wake of the ACA's mandate thereby circumventing the ACA's preventive service provisions requiring women access to and coverage for Comprehensive Lactation Support.

      i.   Women forego Comprehensive Lactation Benefits because they are unable to pay out-of-pocket, *ergo*, Defendants never have to administer and pay for the preventive service; or

     ii.   Women pay out-of-pocket for Comprehensive Lactation Benefits, never seek reimbursement from Defendants, *ergo*, Defendants never have to administer or pay for the preventive service; or,

   iii.   Women pay out-of-pocket for Comprehensive Lactation Benefits, seek reimbursement, and get either no or partial reimbursement, *ergo,* Defendants pay nothing or less for the preventive service than if they had established a network of trained providers of Comprehensive Lactation Benefits, and force women to pay out-of-pocket.

(C)    Because of Defendants' failure to provide in-network trained providers, Plaintiffs and the members of the Class are forced to either forego the Comprehensive Lactation Benefits preventive service or go out-of-network to get it. It is not by Plaintiffs' and the members of the Class own choosing to go "out-of-network." It is of Defendants' making. Yet, Defendants exploit their wrongful conduct by, at best, reimbursing only a portion of the out-of-pocket costs or flatly denying any reimbursement or coverage for Comprehensive Lactation Benefits, because Plaintiffs and the members of the Class used "out-of-network" providers.

10.    The scheme, coupled with the Defendants' other tactics to avoid giving women access to and coverage for Comprehensive Lactation Benefits, violates the ACA and their duties to Plaintiffs and the members of the Class.

11.    Plaintiffs are enrolled in health care plans ("health care plans" or "plans") insured or administered by Defendants, which health care plans include Employee Welfare Benefit Plans as that term is defined in 29 U.S.C. § 1002(1)(A), as well as individual and family health care plans offered directly by Defendants, or on an insurance exchange pursuant to the applicable provisions of the ACA ("ACA Exchanges"). Based on the Defendants' conduct and the claims

alleged herein, Plaintiffs on behalf of themselves and the members of the Class seek to put an end to, and secure monetary redress for, Defendants' wrongful and harmful conduct.   Such conduct is done in flagrant disregard of the ACA and the right it created for women to access preventive health benefits.

12.     Such conduct violates: the ACA's anti-discrimination provisions prohibiting discrimination on the basis of gender; the plan documents which incorporate by reference the ACA's preventive service provisions; and, the Employee Retirement Income Security Act ("ERISA").  Defendants also have been unjustly enriched at Plaintiffs' and the Class' expense. Plaintiffs seek monetary and injunctive relief for themselves and the members of the Class to stop and redress the substantial harms inflicted by Defendants.

## PARTIES

### *Plaintiffs.*

13.     Plaintiff Lindsay Ferrer ("Ferrer") is an adult individual residing in Washington, D.C.  Plaintiff Ferrer, through her husband's employer, DC Lawyers for Youth, was insured by a non-grandfathered CareFirst, Inc. ("CFI") plan through November 30, 2015 and a non-grandfathered CareFirst BlueChoice, Inc. ("CFBC") plan effective December 1, 2015.   After the birth of her child in November 2015, Plaintiff Ferrer sought coverage from CFBC for comprehensive lactation support and counseling, but was issued only partial reimbursement resulting in an out-of-pocket expenditure of $406.15.

14.     Plaintiff Amy Haddad ("Haddad") is an adult individual residing in Potomac, MD.  Plaintiff Haddad is, and was, at all relevant times, insured by a non-grandfathered CareFirst BlueCross BlueShield ("CareFirst BCBS") plan through her employer, the Association of Maternal and Child Health Programs.  After the birth of her child in February 2015, Plaintiff Haddad sought coverage from CareFirst BCBS for comprehensive lactation support and counseling, but was issued only partial reimbursement resulting in an out-of-pocket expenditure of $290.73.

15. Plaintiff Sarah Sorscher ("Sorscher") is an adult individual residing in Washington, D.C. Plaintiff Sorscher is, and was, at all relevant times, insured by a non-grandfathered CareFirst BlueCross BlueShield ("CareFirst BCBS") plan through her employer, Public Citizen. After the birth of her child in July 2014, Plaintiff Sorscher sought coverage from CareFirst BCBS for comprehensive lactation support and counseling, but was issued only partial reimbursement resulting in an out-of-pocket expenditure of $100.73.

*Defendants.*

16. Defendant CareFirst, Inc. ("CFI") is a Maryland corporation doing business in the District of Columbia, Maryland and the Commonwealth of Virginia. CFI is the parent company of GHMS and CFM which, together, hold joint interests in CFBC. CFI's principal place of business is located at 10453/10455 Mill Run Circle, Owings Mills, Maryland 21117.

17. Defendant Group Hospitalization and Medical Services, Inc. ("GHMS") is a corporation incorporated under the laws of the District of Columbia with its principal place of business located at 840 First Street, NE, Washington, D.C. 20065. GHMS does business as CareFirst BlueCross BlueShield, and is an independent licensee of the Blue Cross and Blue Shield Association. GHMS provides insurance products and administrative services to individuals and groups, and does business, in Maryland, the District of Columbia, and the Commonwealth of Virginia.

18. Defendant CareFirst of Maryland, Inc. ("CFM") is a Maryland corporation with its principal place of business located at 10453/10455 Mill Run Circle, Owings Mills, Maryland 21117. CFM does business as CareFirst BlueCross BlueShield, and is an independent licensee of the Blue Cross and Blue Shield Association. CFM provides insurance products and administrative services to individuals and groups, and does business, in the State of Maryland and the District of Columbia.

19. CareFirst BlueCross BlueShield ("CareFirst BCBS") is a not-for-profit, non-stock health services company which, through its affiliates and subsidiaries, including Defendants GHMS and CFM, offers insurance products and administrative services to individuals and

groups in Maryland, the District of Columbia and portions of Northern Virginia. CareFirst BCBS' corporate headquarters are in Union Center Plaza, 840 First Street, NE, Washington, D.C. 20065.

20.     Defendant CareFirst BlueChoice, Inc. ("CFBC") is a corporation formed under the laws of the District of Columbia with a principal place of business located at 840 First Street, NE, Washington, D.C. 20065.  CFBC is an affiliate company of the other Defendants and also offers health benefit products and services in the District of Columbia, Maryland, and the Commonwealth of Virginia.

21.     Whenever in this Complaint reference is made to any act, deed or transaction of Defendants, the allegation is imputed to its officers, directors, agents, employees or representatives.

22.     Defendants provide group and individual health insurance and managed care products that are subject to all provisions of the ACA, and purportedly operate the largest health care insurer in the Mid-Atlantic region serving individuals, businesses and governmental agencies totaling 3.2 million members, employing approximately 5,000 associates and contractors in Maryland, Washington, D.C. and Northern Virginia, and serving more than 577,000 members in the Federal Employees Health Program (FEP) – the largest FEP enrollment in the nation. *See*   https://individual.carefirst.com/individuals-families/about-us/company-overview.page (last visited 10/24/2016).

23.     Defendants also offer health insurance plans directly to individuals through the Exchanges.[3] Defendants offered and administered the following ACA Exchange Plans, among

---

[3] Under the ACA, starting in 2014, individuals were required to buy health insurance or face penalties.  To facilitate that, the ACA requires every state to offer a public marketplace for its residents to research and purchase health insurance, the Exchange. States have a few options: A state can choose to create and run its own exchange; or, if a state decides not to run its own exchange, residents of that state can shop on an exchange that will be run by the federal government; or, a state can partner with the federal government, and the state and federal government share responsibility for operating that state's exchange. No matter what each state decides to do, an Exchange is available to residents in every state and the health insurance plans that are made available on the Exchange are the ACA Exchange Plans.  Among other things, the

others: In the District of Columbia, GHMS and CFBC offered plans through the District of Columbia Exchange called DC Health Link for plan years 2014, 2015 and 2016. In Maryland, CFM, GHMS, and CFBC and offered plans through the Maryland Health Benefit Exchange called the "Maryland Health Connection" for plan years 2014, 2015 and 2016. In Virginia, CareFirst BCBS and CFBC offered plans on the Virginia Exchange called the Virginia Health Insurance Exchange for plan year 2014; for plan year 2015, CareFirst BCBS, GHMS, and CFBC offered plans; for plan year 2016 GHMS and CFBC offered plans.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action based on diversity of citizenship under the Class Action Fairness Act and 28 U.S.C. § 1332(d)(2).  The amount in controversy, exclusive of interest and costs, exceeds the sum or value of five million dollars ($5,000,000) and is a class action in which members of the Class are citizens of states different from Defendants.  Further, greater than two-thirds of the members of the Class reside in states other than the state in which Defendants are citizens.

25.     The Court also has federal question subject matter jurisdiction based on the ACA claims asserted herein.

26.     In addition, this action is brought by Plaintiffs pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to remedy Defendants' violations of ERISA §§ 404(a) and 405(a), 29 U.S.C. §1104(a) and § 1105(a). This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1). Moreover, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), provides for nationwide service of process. All Defendants are residents of the United States and subject to service in the United States, and this Court therefore has personal jurisdiction over them. Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b), because Defendants reside or may be found in this district.

---

ACA provides tax credits and subsidies for individuals who qualify, to help make insurance more affordable, when they purchase insurance on the Exchange.

27.     This Court also has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in the District of Columbia.   Each Defendant systematically and continuously conducts business in the District of Columbia and otherwise has minimum contacts with the District of Columbia sufficient to establish personal jurisdiction.   Each Defendant is authorized to do business and is conducting business throughout the United States, including in this District, authorized to market and sell, and have in fact marketed and sold health insurance and healthcare products to citizens in this District, has sufficient minimum contacts with the various states of the United States, including this District, and/or sufficiently avails itself of the markets of the various states of the United States, including in this District, through its promotion, sales, and marketing within the United States, including in this District, to render the exercise of personal jurisdiction by this Court permissible.

28.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this District and Defendants regularly conduct and transact business in this District and are therefore subject to personal jurisdiction in this District. Venue is also proper because Defendants are authorized to conduct business in this District and have intentionally availed themselves of the laws and markets within this District through promotion, marketing, and sales in this District.

## FACTUAL ALLEGATIONS

### A.     Breastfeeding is a National Public Health Policy.

29.     The protection, promotion and support of breastfeeding have been a national public policy for over 25 years.  In October 2000, former Surgeon General David Satcher, M.D., Ph.D. issued the *HHS Blueprint for Action on Breastfeeding,* then reiterating the commitment of previous Surgeons General to support breastfeeding as a public health goal.   *See* http://www.pnmc-hsr.org/wp-content/uploads/2011/01/BreastfeedingBlueprint.pdf  (last visited 9/21/2016).

30.     Breastfeeding, with its many known health benefits for infants, children, and mothers, is a key strategy to improve public health. According to the CDC, breastfeeding is one of the most effective preventive measures mothers can take to protect their health and that of their children. CDC, *Strategies to Prevent Obesity and Other Chronic Diseases: The CDC Guide to Strategies to Support Breastfeeding Mothers and Babies*. Atlanta: U.S. Department of Health and Human Services, 2013, available at: http://www.cdc.gov/breastfeeding/pdf/BF-Guide-508.PDF  (last visited 9-7-16).

31.     In 2011, Regina M. Benjamin, M D., M.B.A. Vice Admiral U.S. Public Health Service Surgeon General and Kathleen Sebelius the then HHS Secretary jointly issued the *HHS Call to Action* specifying the society-wide responsibilities to encourage and support breastfeeding ("*HHS Call to Action*"). HHS, *The Surgeon General's Call to Action to Support U.S. Department of Health and Human Services. The Surgeon General's* Call to Action to Support Breastfeeding. 2011, available at: http://www.ncbi.nlm.nih.gov/books/NBK52682/pdf/Bookshelf_NBK52682.pdf  (last visited 9/7/2016).

32.     Further, numerous prominent medical organizations, including but not limited to, the American Academy of Pediatrics, the American Academy of Family Physicians, the American College of Obstetricians and Gynecologists, the American College of Nurse-Midwives, the American Dietetic Association, and the American Public Health Association, recommend that breastfeeding commence immediately upon birth and continue uninterrupted until the child's first birthday. *HHS Call to Action*, *supra*, p. 4.

33.     Therefore, access to and coverage for Comprehensive Lactation Benefits advances the long held public policy goal to improve the health of Americans by increasing access and diminishing the cost barriers to sustained breastfeeding during the first year of a child's life.  As detailed in the *HHS Call to Action:*

(a)     the American Academy of Pediatrics stated, "Human milk is species-specific, and all substitute feeding preparations differ markedly from it, making human milk uniquely superior for infant feeding. Exclusive breastfeeding is the

reference or normative model against which all alternative feeding methods must be measured with regard to growth, health, development, and all other short- and long-term outcomes." *HHS Call to Action*, *supra*, p. 5.

(b)      "The health effects of breastfeeding are well recognized and apply to mothers and children in developed nations such as the United States as well as to those in developing countries. Breast milk is uniquely suited to the human infant's nutritional needs and is a live substance with unparalleled immunological and anti-inflammatory properties that protect against a host of illnesses and diseases for both mothers and children." *Id*. at p. 1.

(c)      Quality sustained breastfeeding provides health benefits to the mother, including lowered risk of breast and ovarian cancers, and long term health benefits to the infant, which in turn enhance the health of society and decrease costs due to poor childhood and adult health. Breast-fed babies suffer lower rates of hospitalizations for lower respiratory tract diseases in the first year, gastrointestinal infection, acute ear infection, Sudden Infant Death Syndrome, childhood leukemia, asthma, type 2 diabetes, and childhood obesity. *Id*. at p. 2.

34.      The *HHS Call to Action* also cited psychological, economic and environmental benefits attributed to breastfeeding. Specifically that: breastfeeding may reduce the risk of postpartum depression; families who follow optimal breastfeeding practices could save more than $1,200 to $1,500 a year in expenditures for infant formula in the first year alone; If 90% of the US families followed guidelines to breastfeed exclusively for six months, the US would save $13 billion annually from reduced direct medical and indirect costs[4] and the cost of premature death; if 80% of families followed the guidelines, $10.5 billion a year would be saved; and, environmentally, breastfeeding requires minimal additional resources (a small amount of

---

[4] Costs related to illnesses reduced or avoided through breast-feeding include: sudden infant death syndrome, hospitalizations for lower respiratory tract infection in infancy, atopic dermatitis, childhood leukemia, childhood obesity, childhood asthma and type 1 diabetes mellitus.

additional calories is all that is required) compared to infant formula that requires a significant carbon footprint of energy to produce formula, paper containers to store and ship that largely end up in landfills and fuel to prepare, ship and store. *Id.* at pp. 3-4.

35.     The importance of education is a central theme in the *HHS Call to Action:*

> "Unfortunately, education about breastfeeding is not always readily available to mothers nor easily understood by them. Many women rely on books, leaflets, and other written materials as their only source of information on breastfeeding, but using these sources to gain knowledge about breastfeeding can be ineffective, especially for low income women, who may have more success relying on role models. *The goals for educating mothers include increasing their knowledge and skills relative to breastfeeding and positively influencing their attitudes about it."*

*HHS Call to Action*, *supra*, p. 11,(emphasis added).

36.     The HHS *Call to Action* also highlighted that mothers need "access to trained individuals who have established relationships with members of the health care community, are flexible enough to meet mother's needs outside of the traditional work hours and locations, and provide consistent information." *Id.* Yet, outside of the hospital setting, mothers "may have no means of identifying or obtaining  the skilled support needed to address their concerns about lactation and breastfeeding; further, there may be barriers to reimbursement for needed lactation care and services." HHS, *Call to Action*, *supra*, p. 25.

37.     According to the HHS *Call to Action,* International Board Certified Lactation Consultants ("IBCLCs") are credentialed health care professionals specializing in the clinical management of breastfeeding, are the "only health care professionals certified in lactation management", and are certificated by the International Board of Lactation Consultant Examiners which operates "under the direction of the U.S. National Commission for Certifying Agencies and maintains rigorous professional standards." *Id.* at p. 27.   IBCLCs work in many health care settings, such as hospitals, birth centers, physicians' offices, public health clinics, and their own offices.   There are over 15,000 certified IBCLCs in the United States; average charges range from $120 - $350 per session, based on location.

38.     In 2013, the CDC set objectives, illustrated in the chart below, to promote, support, and ultimately increase breastfeeding rates in the United States by 2020.

| *Healthy People 2020* Objectives | | |
|---|---|---|
| **Maternal, Infant, and Child Health (MICH) Objectives** | **Baseline** | **Target** |
| MICH 21: Increase the proportion of infants who are breastfed | | |
| Ever | 74.0% | 81.9% |
| At 6 months | 43.5% | 60.6% |
| At 1 year | 22.7% | 34.1% |
| Exclusively through 3 months | 33.6% | 46.2% |
| Exclusively through 6 months | 14.1% | 25.5% |

*See* CDC, *Strategies to Prevent Obesity and Other Chronic Diseases: The CDC Guide to Strategies to Support Breastfeeding Mothers and Babies*. Atlanta: HHS; 2013, available at: http://www.cdc.gov/breastfeeding/pdf/BF-Guide-508.PDF (last visited 9/7/2016).

39.     Over the past few decades, the rate of breastfeeding has increased, but disparities have persisted. "Research suggests that 1) race and ethnicity are associated with breastfeeding regardless of income, and 2) income is associated with breastfeeding regardless of race or ethnicity." *Id.* at p. 9.



Wall Street Journal, *5 Reasons American Women Won't Breastfeed*, April 14, 2014, available at: http://blogs.wsj.com/briefly/2014/04/14/5-reasons-american-women-wont-breastfeed/ (last visited 9/21/ 2016).

40.     As reported on September 3, 2016 by *The New York Times* Editorial Board, in "America's Shocking Maternal Deaths", the rate at which women die during pregnancy or shortly after childbirth *has risen* materially in the United States, with the United States having the second-highest maternal mortality rate among 31 members of the Organization for Economic Cooperation and Development; only Mexico had a higher rate. For example, in Texas "the maternal mortality rate doubled from 17.7 per 100,000 live births in 2000 to 35.8 in 2014. Compare that with Germany, which had 4.1 deaths per 100,000 live births in 2014."  As the article asserted: "A big part of the problem is the inequality embedded in America's health care system. The [ACA] made health insurance more available, but millions of families still cannot afford the care they need." The inequality of the United States health care system exists directly because of conduct of the type alleged herein: insurers' bolstering their bottom lines by avoiding costs of mandated women's health care services and shifting the cost, which is more than just dollars and cents, to women.

41.     Addressing the pervasive disparities that existed in the American health care system (and continue to) and securing for all women and families the immense health benefits of breastfeeding are the impetuses of the preventive service mandates of the ACA and its inclusion of providing access to and coverage of Comprehensive Lactation Benefits.

**B.      Breastfeeding and Comprehensive Lactation Benefits Are Time-Sensitive.**

42.     Importantly, and obviously, breastfeeding *is an extremely time-sensitive event*. Initiating breastfeeding within the first hours and days of a newborn's life can significantly impact its success.  *HHS Call to Action*, *supra*, pp. 21-22.

43.     Moreover, the need for Comprehensive Lactation Benefits often arises days after birth, when the mother and child are home, and during this postpartum period the provision of Comprehensive Lactation Benefits is essential to the continuation of successful breastfeeding. *Id*. at p. 13. Further, continuation of breastfeeding upon illness or a mother's return to work presents

another critical milestone; it is at such times that a mother may seek Comprehensive Lactation Benefits, as well as access to breastfeeding pumps. *Id.* at pp. 29-32.

44.     Lactation support, encouragement, education and counseling must be timely and occur during pregnancy, at the time of birth and until the child is weaned. Lactation equipment may be necessary immediately following birth, at one or several times during the first year, or continuously during the first year.  Immediate access to lactation services and products is critical because the window to address such needs is narrow.

**C.     Comprehensive Lactation Benefits Are a Preventive Service Required by the ACA.**

45.     The ACA provides the following in relevant part:

> A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for . . . (4) with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph...

42 U.S.C. § 300gg-13(a)(4).

46.     The required preventive services derive from recommendations made by four expert medical and scientific bodies – the U.S. Preventive Services Task Force ("USPSTF"), the Advisory Committee on Immunization Practices, the HRSA, and the Institute of Medicine committee on women's clinical preventive services. The USPSTF is an independent panel of sixteen nationally recognized experts in primary care and prevention who systematically reviews the evidence of effectiveness and develops recommendations for clinical preventive services. The panel is convened by the Agency for Healthcare Research and Quality, which is part of HHS.  Recommendations issued by the USPSTF are considered to be the "gold standard" for clinical preventive services. When analyzing a particular preventive service, the USPSTF evaluates the balance of potential benefits against harms, and then assigns a letter grade to the

service. A letter grade of "A" or "B" means the service is recommended and that the benefit is moderate to substantial.[5]   In its Final Recommendation Statement issued in October 2008, USPSTF recommended "intervention during pregnancy and after birth to promote and support breastfeeding" with a grade B.[6]

47.     Section 2713 of the Public Health Service Act states:

"Non-grandfathered group health plans and health insurance coverage offered in the individual or group market are required to cover without the imposition of any cost-sharing requirements, the following items or services:

Evidenced-based items or services that have in effect a rating of "A" or "B" in the current recommendations of the United States Preventive Services Task Force (USPSTF) with respect to the individual involved, except for the recommendations of the USPSTF regarding breast cancer screening, mammography, and prevention issued in or around November 2009, which are not considered in effect for this purpose;

                    *          *                *

With respect to women, evidence-informed preventive care and screening provided for in comprehensive guidelines supported by HRSA, to the extent not included in certain recommendations of the USPSTF…."

48.     The comprehensive HRSA Guidelines, Women's Preventive Services: Required Health Plan Coverage Guidelines, were adopted and released on August 1, 2012, and expanded the previously required intervention to promote and support breastfeeding **by requiring new plans, as of August 1, 2012, to cover comprehensive prenatal and postnatal lactation support and counseling, and breastfeeding equipment and supplies, such as breast pumps, for the duration of breastfeeding without co-payments, deductibles, or co-insurance.**[7]

---

[5]  *See* USPSTF, available at http://www.uspreventiveservicestaskforce.org/ (last visited 5/11/2016).

[6]                *See*                USPSTF,                available                at http://www.uspreventiveservicestaskforce.org/Page/Document/UpdateSummaryFinal/breastfeeding-counseling (last visited 10/26/2016).

[7]HHS,        Women's        Preventive        Services        Guidelines,        available        at http://www.hrsa.gov/womensguidelines/ (last visited 10/26/2016).

49.     Section 1001 of the ACA amends § 2713 of the Public Health Services Act to provide that all non-grandfathered group health plans and health insurance issuers offering group or individual coverage are required to cover one hundred percent (100%) of the costs of certain recommended preventive services for women, including "comprehensive lactation support and counseling and costs of renting or purchasing breastfeeding equipment for the duration of breastfeeding."[8]

50.     The ACA requirement mandating comprehensive prenatal and postnatal lactation support, supplies, and counseling applies to *all* private plans – including individual, small group, large group, and self-insured plans in which employers contract administrative services to a third party payer – with the exception of those plans that maintain "grandfathered" status.[9]

51.     The DOL, HHS, and the Treasury Department (the "Departments") are charged with establishing regulations and guidelines that specify the implementation of the ACA. The Departments have jointly prepared Frequently Asked Questions ("FAQs") regarding the implementation of the ACA, including FAQs regarding preventive services and Comprehensive Lactation Benefits.  These FAQs are publicly available, including through the DOL and CMS websites.

52.     In the FAQs Part XXIX, dated October 23, 2015, the Departments reiterated previous guidance and "answer questions from stakeholders to help people understand the laws

---

[8] *See* FAQs About Affordable Care Act Implementation (Part XII), Q20, which states that "coverage of comprehensive lactation support and counseling and costs of renting or purchasing breastfeeding equipment extends for the duration of breastfeeding," available at www.dol.gov/ebsa/faqs/faq-aca12.html  and  www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/aca_implementation_faqs12.html (last visited 10/10/2016).

[9] To be classified as "grandfathered," plans must have (1) been in existence prior to March 23, 2010; (2) refrained from making significant changes to the benefits or plan participants' costs since that time; and (3) had at least one person enrolled in the plan on March 23, 2010 and continually covered at least one individual since that date. While there is no specific termination date for grandfathered status, it is expected that eventually all plans will lose their grandfathered status.  As of 2014, only about a quarter of workers with employer sponsored coverage participated were in grandfathered plans.

and benefit from them, as intended." *See* https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-xxix.pdf (last visited 10/18/2016).

53. Questions 1 through 5 of the FAQs Part XXIX, which specifically address Comprehensive Lactation Benefits under the ACA are provided here (emphasis added):

**Q1: Are plans and issuers required to provide a list of the lactation counseling providers within the network?**

*Yes.* The HRSA guidelines provide for coverage of comprehensive prenatal and postnatal lactation support, counseling, and equipment rental as part of their preventive service recommendations, including lactation counseling…group health plans subject to the Employee Retirement Income Security Act (ERISA)…must provide a Summary Plan Description (SPD) that describes provisions governing the use of network providers, ***the composition of the provider network,*** and whether, and under what circumstances, coverage is provided for out-of-network services …issuers of qualified health plans (QHPs) in the individual market Exchanges and the SHOPs currently ***must make their provider directories available online.***

**Q2:** My group health plan has a network of providers and covers recommended preventive services without cost sharing when such services are obtained in-network. **However, the network does not include lactation counseling providers. Is it permissible for the plan to impose cost sharing with respect to lactation counseling services obtained outside the network?**

*No.* As stated in a previous FAQ, while nothing in the preventive services requirements under section 2713 of the PHS Act or its implementing regulations requires a plan or issuer that has a network of providers to provide benefits for preventive services provided out-of-network, ***these requirements are premised on enrollees being able to access the required preventive services from in-network providers***…if a plan or issuer does not have in its network a provider who can provide a particular service, then the plan or issuer must cover the item or service when performed by an out-of-network provider and not impose cost sharing with respect to the item or service. Therefore, if a plan or issuer does not have in its network a provider who can provide lactation counseling services, the plan or issuer must cover the item or service when performed by an out-of-network provider without cost sharing.

**Q3: The State where I live does not license lactation counseling providers and my plan or issuer will only cover services received from providers licensed by the State. Does that mean that I cannot receive coverage of lactation counseling without cost sharing?**

*No.* Subject to reasonable medical management techniques, ***lactation counseling must be covered*** without cost sharing by the plan or issuer when it is performed by any provider acting within the scope of his or her license or certification under applicable State law. Lactation counseling could be provided by another provider type acting within the scope of his or her license or certification (for example, a registered nurse), and the plan or issuer would be required to provide coverage for the services without cost sharing.

**Q4: A plan or issuer provides coverage for lactation counseling without cost sharing only on an inpatient basis. Is it permissible for the plan or issuer to impose cost sharing with respect to lactation counseling received on an outpatient basis?**

*No.* If a recommendation or guideline does not specify the frequency, method, treatment, or setting for the provision of a recommended preventive service, then the plan or issuer may use reasonable medical management techniques to determine any such coverage limitations. However, ***it is not a reasonable medical management technique to limit coverage for lactation counseling to services provided on an in-patient basis***. Some births are never associated with a hospital admission (e.g., home births assisted by a nurse midwife), and it is not permissible to deny coverage without cost sharing for lactation support services in this case. Moreover*, **coverage for lactation support services without cost sharing must extend for the duration of the breastfeeding which, in many cases, extends beyond the in-patient setting for births that are associated with a hospital admission.***

**Q5: Are plans and issuers permitted to require individuals to obtain breastfeeding equipment within a specified time period (for example, within 6 months of delivery) in order for the breastfeeding equipment to be covered without cost sharing?**

***No. The requirement to cover the rental or purchase of breastfeeding equipment without cost sharing extends for the duration of breastfeeding***, provided the individual remains continuously enrolled in the plan or coverage.[10]

54.   Among other things, the FAQs confirm that:

(a)  Defendants are required to provide a list of network lactation consultants.

---

[10] CMS, *"FAQs About Affordable Care Act Implementation (Part XXIX) And Mental Health Parity Implementation" (October 23, 2015), Q1-5,* available at: https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/FAQs-Part-XXIX.pdf (last visited 10/14/2016) (emphasis added).

(b) If a plan does not have in-network lactation consultant providers, the plan may not impose cost sharing for lactation consulting services obtained out of network.

(c) If a state does not license lactation counselors and plans require providers to be licensed by the state, and the service could not be provided in the scope of another type of provider license (such as a registered nurse), the plan will have to provide coverage for the services without cost sharing.

(d) Plans may not limit lactation counseling services without cost sharing to an inpatient basis.

(e) Coverage for lactation support services must extend for the duration of breastfeeding.

(f) Plans may not require individuals to obtain equipment within a specified time period, such as within six months of delivery, in order for it to be covered without cost sharing.

55.     The fact of having in network providers of the required preventive service is key and is highlighted in the following relevant subsections of 29 CFR 2590.715-2713(a)(3) (titled "Coverage of preventive health services.", emphasis added): **"**(3) *Out-of-network providers* - (i) Subject to paragraph (a)(3)(ii) of this section, nothing in this section requires a plan or issuer ***that has a network of providers to provide benefits for items or services described in paragraph (a)(1) of this section that are delivered by an out-of-network provider***. Moreover, nothing in this section precludes a plan or issuer ***that has a network of providers from imposing cost-sharing requirements for items or services described in paragraph (a)(1) of this section that are delivered by an out-of-network provider***.  (ii) If a plan or issuer does not have in its network a provider who can provide an item or service described in paragraph (a)(1) of this section, the plan or issuer must cover the item or service when performed by an out-of-network provider, and may not impose cost sharing with respect to the item or service."

56.     Plainly, if an insurer maintains a network of providers for Comprehensive Lactation Benefits, then an insured who elects or prefers to go to an out-of-network provider may have a cost imposed on her.  Plaintiffs and the members of the Class, however, had no such choice.  Yet, Defendants have forced Plaintiffs and the members of the Class to either forego the preventive services or go out-of-network and pay the price.  That violates the ACA, the anti-discrimination provisions of the ACA, the terms of the plan documents and ERISA.

**D.      Defendants Have Engaged in a Systemic Practice With Respect to Comprehensive Lactation Benefits that Violates the Preventive Service Mandates of the ACA.**

57.     CareFirst provides and serves as an administrator for non-grandfathered health plans that are required to cover certain preventive health services and screenings, including Comprehensive Lactation Benefits, as alleged *supra*.

58.     In addition, CareFirst's health plans and plan documents set forth, in substantially the same manner, that each health plan provides preventive care benefits in accordance with the ACA, including for Breastfeeding support, supplies and consultation. For example, the CFBC plans provide:

D.      Preventive Services.
In addition to the benefits listed in this provision, CareFirst BlueChoice will provide additional benefits for health exams and other services for the prevention and detection of disease, at intervals appropriate to the Member's age, sex and health status, in accordance with the Patient Protection and Affordable Care Act, as amended, and the Health Care and Education Reconciliation Act of 2010, as amended, as well as CareFirst BlueChoice preventive guidelines.

CareFirst BlueChoice shall update new recommendations to the preventive benefits listed in this provision at the schedule established by the Secretary of Health and Human Services.

59.     CareFirst's website provides a "health library" that directs women, with breastfeeding services, to get assistance and specifically so from IBCLCs.  The following is just a sample of such statements from CareFirst's health library:



Source: http://carefirst.staywellsolutionsonline.com/ (last visited 10/27/2016)



Source: http://carefirst.staywellsolutionsonline.com/Search/90,P02650 (last visited 10/26/2016)



Source: http://carefirst.staywellsolutionsonline.com/Search/90,P02878 (last visited 10/26/2016)



Source: http://carefirst.staywellsolutionsonline.com/Search/90,P02886 (last visited 10/26/2016)

60.     With the expansion of women's preventive services beginning August 1, 2012, "about 47 million women **gained guaranteed access to** additional preventive services **without paying more at the doctor's office**."   HHS*, Affordable Care Act Rules on Expanding Access to Preventive Services for Women*,   http://www.hhs.gov/healthcare/facts-and-features/fact-sheets/aca-rules-on-expanding-access-to-preventive-services-for-women/index.html   (last visited 9/7/2016) (emphasis added). And, under the ACA provisions, the nearly 4 million children born annually in the United States and their mothers **are entitled to timely, comprehensive lactation education and support**. CDC, *National Vital Statistics Report,* Vol. 4, number 1, at p. 1 (Jan. 1, 2015)  (available  at:  http://www.cdc.gov/nchs/data/nvsr/nvsr64/nvsr64_01.pdf   (last  visited 9/7/2016).

61.     Defendants, however, have prevented women from getting the guaranteed access to timely Comprehensive Lactation Benefits by circumventing the clear requirement that health plans provide, at no cost, Comprehensive Lactation Benefits as a preventive service, just like all other preventive services.

62.     In contravention of the ACA's preventive health services mandate and CareFirst's plan documents, Defendants have failed to provide mandated preventive benefits coverage for

Comprehensive Lactation Benefits to the detriment of plan members including by (among other things):

(a) failing to establish a network of lactation consultants;

(b) improperly attributing an out-of-network characterization to Comprehensive Lactation Benefits in response to insureds' inquires and when such benefits are sought;

(c) imposing major administrative barriers to insureds seeking to receive information about and access to Comprehensive Lactation Benefits;

(d) failing to construct a list of in-network of providers of Comprehensive Lactation Benefits;

(e) failing to provide any list of in-network providers of Comprehensive Lactation Benefits including failing to provide such list either by mail, through customer representatives that provide phone consultation to members, or through the CareFirst website; and

(f) providing inaccurate information to insures, including in the Explanation of Benefits ("EOBs"), with respect to the cost of Comprehensive Lactation Benefits, state a denial of coverage for 100% of the cost of Comprehensive Lactation Benefits, treat it as an out-of-network benefit, and advise the member that the provider may balance bill the member for the difference between (a) the cost charged by the provider and (b) the amount allowed by the out of network benefit.

63.     Defendants have, contrary to the plain intent and purpose of the ACA's imposition of no-cost preventive services and the inclusion of Comprehensive Lactation Benefits as a preventive service, improperly shifted costs to the insured by failing to establish a network of providers of Comprehensive Lactation Benefits, and that such network is made known to and assessable by the Plaintiffs and insureds.

64.     In addition to general administrative burdens, CareFirst has exhibited a pattern of conduct intentionally designed to: (1) frustrate a woman's exercise of the appeal rights and to encourage women to give up seeking reimbursement and (2) deny providers guidance that would aid other plan beneficiaries in seeking coverage or reimbursement. Such abuses include: inconsistent guidance from CareFirst representatives, lack of timely responsiveness for pre-authorization or provider requests and changing purportedly applicable codes for Comprehensive Lactation Benefits.

65.     Defendants have also wrongly erected significant administrative barriers that prevent and deter women from obtaining timely Comprehensive Lactation Benefits. Among these barriers, Defendants have failed to establish a network of providers and failed to provide plan participants with any list or directory that clearly disclose the in-network providers (if any) of Comprehensive Lactation Benefits.[11]

66.     For example, CareFirst's website (last visited 10/25/2016) provides "No results found" for lactation, breastfeeding, or IBCLC provider searches within 30 miles (greatest distance searchable) of Washington, D.C. for BlueChoice, Health Blue and Blue Preferred (PPO) plans:

---

[11] At times, insureds seeking the identity of a covered Comprehensive Lactation Benefit provider have been told to try to find one in a hospital or clinical practice group (obstetricians – gynecologists, pediatricians, and other providers of maternal and child care). Physicians and clinicians who "are ambivalent about breastfeeding or who feel inadequately trained to assist patients with breastfeeding may be unable to properly counsel their patients on specifics about breastfeeding techniques, current health recommendations on breastfeeding, and strategies to combine breastfeeding and work." HHS, *Call to Action*, supra, p. 15. In a recent study of obstetricians' attitudes, 75% admitted they had either inadequate or no training in how to appropriately educate mothers about breastfeeding. The information on breastfeeding included in medical texts is often incomplete, inconsistent, and inaccurate." *Id.* at p. 26.



67.     In addition, in response to requests by insureds for the identity of in-network providers of Comprehensive Lactation Benefits, Defendants take several weeks to issue a response that there is no in-network providers.

68.     Also, Defendants have told insureds who are seeking Comprehensive Lactation Benefits to seek "prior authorization" for the preventive service, which takes weeks to approve

before an insured may have provider to render the Comprehensive Lactation Benefits, assuming it is not too late.

69.     Time is of the essence with breastfeeding. Mothers that seek out and need what was to be a no-cost guaranteed ACA women's preventive service, have become victims to Defendants' barriers, erected to prevent mothers from timely getting, if they can get at all, Comprehensive Lactation Support and then causing mothers to, if they get the Support, to pay for it.

70.     Each named Plaintiff, like the members of the Class, has been denied through Defendants' wrongful conduct the women's preventive service benefit for Comprehensive Lactation Benefits that is required by the ACA.

### *Plaintiff Ferrer*

71.     Before the birth of her child on November 5, 2015, Plaintiff Ferrer contacted CFI to ask about coverage for lactation services.  The CFI representative that she spoke with confirmed that CFI did not have any preferred providers for lactation services.  The CFI representative therefore advised that Plaintiff Ferrer could seek up to six consultations from any provider and it would be covered as "in-network".

72.     Shortly after the birth of her child, Plaintiff Ferrer experienced difficulties with breastfeeding.  Plaintiff Ferrer sought lactation support and counseling from the Breastfeeding Center of Greater Washington ("Breastfeeding Center") on three occasions: November 12, 2015; November 28, 2015; and December 17, 2015.  Plaintiff Ferrer paid $280 for the first visit and $180 for each of the two subsequent appointments, for a total out-of-pocket expenditure of $640.

73.     Following her appointments at the Breastfeeding Center, Plaintiff Ferrer submitted the November 12, 2015 and November 28, 2015 under her CFI plan, which she was insured by through November 30, 2015, and submitted the December 17, 2015 claim under her CFBC plan, which went into effect on December 1, 2015.  Each claim was denied as "not a covered service" under the plans.

74.     Plaintiff Ferrer submitted a written appeal contesting the denial of her claims.  On March 16, 2016, CFBC issued a Notice of Appeal Decision that approved coverage for all three of Plaintiff Ferrer's lactation consultation claims at "the Blue Choice in-network benefit level." The EOB forms indicated that CFBC would reimburse a portion of Plaintiff Ferrer's out-of-pocket costs for her lactation consultations, but did not offer any explanation as to how the partial reimbursements were calculated or why the reimbursement amounts differed.  The EOBs reflected the following reimbursement amounts:

(a) November 11, 2015 Appointment: CareFirst reimbursed $79.27 of the $280.

(b) November 28, 2015 Appointment: CareFirst reimbursed $79.27 of the $180.

(c) December 17, 2015 Appointment: CareFirst reimbursed $75.31 of the $180.

75.     Accordingly, because of Defendants' wrongful conduct, Plaintiff Ferrer was denied the no-cost ACA preventive service to which she was entitled. Plaintiff Ferrer estimates that she spent approximately 10-12 hours trying to have her claims for lactation support processed and paid by CFI and CFBC, only to be reimbursed $233.85.  Plaintiff Ferrer did not receive any additional reimbursements from CFI or CFBC for her lactation consultations, resulting in an outstanding out-of-pocket expenditure of $406.15.

### *Plaintiff Haddad*

76.      Following the birth of her child in February 2015, Plaintiff Haddad sought lactation support and counseling.  On February 22, 2015, Plaintiff Haddad had an in-home lactation consultation provided by Milk Matters Lactation Services, for which she paid $190 out-of-pocket.  Then, on April 28, 2015, Plaintiff Haddad sought support and counseling from the Breastfeeding Center, for which she paid $180 out-of-pocket.

77.     In June 2015, Plaintiff Haddad emailed CareFirst BCBS to ask about coverage for lactation services. CareFirst BCBS responded that it "does not have contracting lactation counseling providers as a specialty since these type services may be rendered by [another] provider type[]….".

78.     In October 2015, Plaintiff Haddad submitted to CareFirst BCBS the Breastfeeding Center claim and Milk Matters Lactation Services bill which totaled $370 in out-of-pocket expenditures.

79.     After spending a considerable amount of time trying to obtain coverage for lactation benefits, CareFirst BCBS only processed the Breastfeeding Center claim and issued Plaintiff Haddad a reimbursement for purported "allowed charges" of $79.27, leaving Plaintiff Haddad with an out-of-pocket expenditure of $290.73.

80.     Accordingly, because of Defendants' wrongful conduct, Plaintiff Haddad was denied the no-cost ACA preventive service to which she was entitled.

### *Plaintiff Sorscher*

81.     Following the birth of her child on July 20, 2014, Plaintiff Sorscher sought lactation support and counseling from the Breastfeeding Center on July 23, 2014.  She paid $180 out-of-pocket for the Breastfeeding Center consultation.

82.     On or about September 17, 2014, Plaintiff Sorscher contacted CareFirst BCBS to ask about lactation benefits and coverage.  The CareFirst BCBS representative informed Plaintiff Sorscher that there were no in-network CareFirst BCBS lactation support providers in her area. The representative stated that lactation services would be covered if provided by Plaintiff Sorscher's child's in-network pediatrician, or as an inpatient service through the hospital where she gave birth.   Subsequently, Plaintiff Sorscher confirmed that her child's in-network pediatrician, Mary's Center, did not provide lactation support services.  Plaintiff Sorscher also verified that the hospital where she gave birth, Washington Hospital Center, would not provide lactation support services once a mother was discharged.

83.     Plaintiff Sorscher submitted the Breastfeeding Center claim for coverage to CareFirst BCBS.  On or around October 7, 2014, Plaintiff Sorscher received an EOB from CareFirst BCBS that indicated that of the $180 lactation service fee, only $79.27 was considered "allowed charges". The EOB did not offer any explanation as how the "allowed charge" amount was calculated.  Furthermore, the EOB applied "allowed charges" to Plaintiff Sorscher's out-of-

network deductible as she had not reached her annual deductible.  Therefore, Plaintiff Sorscher paid the entire $180 lactation consultation fee.

84.     Plaintiff Sorscher submitted a written appeal contesting the denial of her claim. Thereafter, she received a second EOB, dated November 3, 2014, adjusting the lactation claim. The $79.27 amount was no longer applied to her out-of-network annual deductible and enclosed was a check for the allowed charges of $79.27.  Plaintiff Sorscher also received a written notice of the Grievance Decision dated November 20, 2014, which stated that the billed amount was higher than some purported "maximum payment" CareFirst BCBS "allowed"; therefore, reimbursement was limited to $79.27.

85.     Accordingly, because of Defendants' wrongdoing, Plaintiff Sorscher was denied the no-cost ACA preventive service to which she was entitled. Plaintiff Sorscher estimates that she spent approximately 10 hours trying to have her claims for lactation support processed and paid by CareFirst BCBS, only to be reimbursed $79.27.  She did not receive any additional reimbursements from CareFirst BCBS for her lactation consultation, resulting in an outstanding out-of-pocket expenditure of $100.73.


**E.     Defendants' Conduct Violates the Non-Discrimination Provision of the ACA.**

86.     Section 1557(a) of the ACA contains a "nondiscrimination" provision that provides, in relevant part:

> [A]n individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under … title IX … shall apply for purposes of violations of this subsection.

42 U.S.C. § 18116(a).

87.     The ACA nondiscrimination provision specifically prohibits discrimination on the basis of those grounds that are prohibited under other federal laws, including Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX").

88.     Title IX prohibits discrimination on the basis of sex.  Plaintiffs and the members of the Class are being excluded from participation in, being denied the benefits of, and being subjected to discrimination by Defendants (in Defendants' capacity as insurers and administrators of insurance plans) on the basis of their sex.

89.     By their conduct alleged herein, Defendants are providing disparate levels of health benefits, and specifically ACA mandated preventive services, for women.

90.     Defendants are subject to Section 18116 because Defendants are health programs and activities which are "receiving Federal financial assistance, including credits, subsidies, or contracts of insurance" may not discriminate on the basis of sex.  *See* 42 U.S.C. § 18116(a) (incorporating Title IX by reference).

91.     Defendants are health programs and activities because they provide and administer health insurance and plans.

92.     Defendants are receiving Federal financial assistance, including credits, subsidies and contracts of insurance, at least in the following ways:

93.     Defendants have entered into agreements or contracts of insurance with the federal government.  Defendants provide health plans to federal employees who are covered through the Federal Employees Health Benefits ("FEHB") Program.  *See* https://www.opm.gov/healthcare-insurance/healthcare/plan-information/plans/2016/state/md/rates;                    https://www.opm.gov/healthcare-insurance/healthcare/plan-information/plans/2016/state/dc  (last visited 10/26/2016).

94.     Defendants also provide health plans through the ACA Exchanges (*see* ¶¶22-23 *supra*) and thereby receive Federal financial assistance in the form of the direct and/or indirect subsidies, including the "premium tax credit", provided for under the ACA for qualified

individuals who purchase health insurance from Defendants through the Exchange.  A premium tax credit is a refundable tax credit designed to help eligible individuals and families with low or moderate income afford health insurance purchased through the Exchange. When enrolled in an Exchange plan, the insured can choose to have the Exchange compute an estimated credit that is paid to the insurance company to lower what the insured pays for monthly premiums (advance payments of the premium tax credit, or APTC). *See* http://fas.org/sgp/crs/misc/R41137.pdf (last visited 10/25/2016). On information and belief, Defendants have received such credits.

95.     In addition to the premium credits, ACA establishes subsidies that are applicable to cost-sharing expenses. The HHS Secretary will provide full reimbursements to exchange plans that provide cost-sharing subsidies.  It was estimated in early 2014, that such cost-sharing subsidies would increase federal outlays from FY2015 through FY2024 by $167 billion. *See* http://fas.org/sgp/crs/misc/R41137.pdf (last visited 10/26/2016). On information and belief, Defendants have received such credits.

96.     Furthermore, the federal government routinely provides grants and/or other financial assistance to CareFirst. A review of the federal-government-run www.USASpending.gov – a website mandated by the Federal Funding Accountability and Transparency Act of 2006 (S. 2590) to give the American public access to information on how their tax dollars are spent – indicates that CareFirst, Inc. received nearly $17 million in grants from the federal government (HHS) between the years 2012 and 2015.[12]

97.     Defendants violated and continue to violate Section 1557(a) of the ACA on the basis of sex discrimination because, as set forth herein, Defendants refuse and otherwise fails to comply with the ACA's provisions with respect to preventive women's care for Comprehensive Lactation Benefits.

98.     By violating the women's preventive services requirements under the ACA, plan participants have been and continue to be denied mandated access to coverage for breastfeeding

---

[12]   *See*   https://www.usaspending.gov/Pages/AdvancedSearch.aspx?k=carefirst   (last   visited 5/10/2016).

benefits. Defendants' denial of benefits and unlawful cost sharing has – in addition to violating the ACA – unjustly enriched Defendants and deprived thousands of women of their mandated lactation benefits. If Defendants' unlawful and discriminatory conduct is not foreclosed, many more mothers will be wrongfully denied the benefits they are entitled to receive under the ACA

**F.      Defendants' Status as, and Duties of, ERISA Fiduciaries.**

99.      ERISA fiduciaries include not only persons explicitly named as fiduciaries in the governing plan documents or those to whom there has been a formal delegation of fiduciary responsibility, but also any other person who in fact performs fiduciary functions. Under ERISA, a person is a fiduciary "to the extent . . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets. . . .," ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), or "he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(iii), 29 U.S.C. § 1002(21)(A)(iii). Thus, if a Defendant exercises discretionary authority or control in managing or administering the plan, or, if it exercises any authority or control (discretionary or not) respecting management or disposition of plan assets, it is an ERISA fiduciary.

100.      At all relevant times, each Defendant has been a fiduciary of the CareFirst health plans because (a) it had the authority with respect to the CareFirst health plans' compliance with the ACA requirements; (b) it exercised discretionary authority and/or discretionary control with respect to the CareFirst health plans' compliance with the ACA requirements; (c) it had the authority to establish a network of providers for Comprehensive Lactation Benefits for the CareFirst health plans; (d) it exercised discretionary authority and/or discretionary control with regard to establishing a network of providers for Comprehensive Lactation Benefits for the CareFirst health plans; (e) it had the authority and/or discretionary responsibility over the management and administration of preventive services as required by the ACA for the CareFirst health plans; and/or, (f) it exercised discretion over the CareFirst plans' provider lists with respect to providers of Comprehensive Lactation Benefits, and, on information and belief, failed

to establish a network of providers in order to maximize its profits and minimize its costs of coverage for ACA women's preventive services.

101.     ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), provide, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. These fiduciary duties under ERISA §§ 404(a)(1), 404(a)(1)(A), and (B) are referred to as the duties of loyalty and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

102.     In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee to protect the interests of the ERISA plans and their participants. An appointing fiduciary must take prudent and reasonable action to determine whether the appointees are fulfilling their fiduciary obligations.

103.     ERISA also holds fiduciaries liable for the misconduct of co-fiduciaries. ERISA § 405(a), 29 U.S.C. § 1105(a). Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility. Because ERISA permits the fractionalization of the fiduciary duty, there may be, as in this case, more than one ERISA fiduciary involved in a given issue.  Even if a fiduciary merely knows of a breach with which it had no connection, it must take steps to remedy that breach. *See* 1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080 ("[I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach. . . .[T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor. The proper remedy is to be determined by the facts and

circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co- fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.").

104.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants and fiduciaries to bring suit "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." The remedies set forth in § 502(a)(3) include remedies for breaches of the fiduciary duties set forth in ERISA § 404, 29 U.S.C. §1104.

105.     In addition, each Plaintiff has either exhausted the administrative remedies available to her and/or further pursuit of the administrative remedies would be futile.  Futility here is clear because pursuit of administrative remedies could not address Defendants' failure to provide, cover, and administer Comprehensive Lactation Benefits as a no-cost preventive service in accordance with the ACA for all CareFirst plans.  Defendants' health plans fail to comply with the provisions of the ACA with respect to preventive services, the redress for which is not accomplished by pursuit of administrative remedies.  Since the action concerns Defendants' violations with respect to the fundamental constructs of the CareFirst plans and networks, and does not evoke Defendants' discretion with respect to the payment of an individual claim, any effort to exhaust administrative remedies is futile and is not required as a matter of law.

106.     Plaintiffs therefore bring this action under the authority of ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), for appropriate equitable relief from Defendants as fiduciaries (and, in the alternative, from Defendants as knowing participants in breaches of any of ERISA's fiduciary responsibility provisions), including without limitation, injunctive relief and, as available under applicable law, imposition of a constructive trust, equitable surcharge, and restitution.

## CLASS ACTION ALLEGATIONS

107.    Plaintiffs bring this action on behalf of themselves and the proposed Class pursuant to FED. R. CIV. P. 23(a), 23(b)(2), and/or 23(b)(3).   Specifically, Plaintiffs seek to represent the following Class:

> All persons who, on or after August 1, 2012, are or were participants in or beneficiaries of any non-Grandfathered Health Plan sold, underwritten or administered by Defendants in their capacity as insurer or administrator, who did not receive full coverage for and/or reimbursement for Comprehensive Lactation Benefits.

108.    Excluded from the Class are Defendants, their subsidiaries or affiliate companies, their legal representatives, assigns, successors, and employees.

109.    The members of the Class are so numerous that joinder of all members is impracticable.  Thousands of members are enrolled in Defendants' health care plans.  Although information is not publicly available at the present time as to the number of women who paid for Comprehensive Lactation Benefits, Plaintiffs allege on information and belief that discovery will show that the putative Class include at least hundreds if not thousands of geographically dispersed women, making joinder of all class members impracticable. Plaintiffs allege on information and belief that the identities and contact information of the members of the Class can be readily ascertained from Defendants' records which include the identities of the Damages Class members who paid for Comprehensive Lactation Benefits.

110.    There are common questions or law and fact within the meaning of Fed. Rule of Civ. P. 23(a)(2).  These common legal and factual questions include, but are not limited to:

   a.    Whether Defendants have violated the ACA's mandate of providing access to and coverage for Comprehensive Lactation Benefits to the members of the Class;

   b.    Whether Defendants unlawfully discriminated on the basis of sex in violation of the ACA by virtue of the conduct described herein;

c.  Whether Defendants owed ERISA fiduciary duties to Plaintiffs and the members of the Class and breached such duties under and/or violated ERISA;

d.  Whether Defendants have been unjustly enriched (and if so, in what amount);

e.  Whether Plaintiffs and the members of the Class are entitled to equitable relief, including but not limited to surcharge, disgorgement of profits, and/or restitution;

f.  Whether Plaintiffs and the members of the Class are entitled to a declaration regarding their rights under ERISA;

g.  Whether Plaintiffs and the members of the Class are entitled to a declaration regarding their rights under the ACA and/or ERISA;

h.  Whether Plaintiffs and the members of the Class are entitled to an Order enjoining Defendants from violating the ACA requirements related to Comprehensive Lactation Benefits and compelling compliance with the ACA; and

i.  The extent and measurement of damages to the Damages Class members for out-of-pocket payments for Comprehensive Lactation Benefits and the nature of other appropriate relief.

111.  Plaintiffs' claims are typical of the claims of the members of the Class within the meaning of Fed. R. Civ. P. 23(a)(3) because Defendants have breached the ACA, the terms of the plans, and their obligations to Plaintiffs and the Class in a uniform manner.  Defendants failed to establish a network of providers of Comprehensive Lactation Benefits and thereby caused Plaintiffs and the members of the Class to pay out-of-pocket for Comprehensive Lactation Benefits.  Defendants unjustly enriched themselves to the detriment of Plaintiffs and the members of the Class who sustained economic injuries arising from the same wrongful and unlawful conduct of the Defendants.

112.  Plaintiffs will fairly and adequately protect the interests of the members of the Class, and none have interests antagonistic to it.  Plaintiffs have retained attorneys experienced in the prosecution of class actions, including healthcare, antitrust, and consumer protection matters, and Plaintiffs and their counsel intend to prosecute this action vigorously.

113.     Plaintiffs and the members of the Class have all suffered, and will continue to suffer harm, and damages as a result of Defendants' unlawful and wrongful conduct.  A class action is superior to any other available methods for the fair and efficient adjudication of this controversy, since joinder of all members of the Class is impracticable and the cost of litigation would far outweigh the likely value of individual class member claims.

114.     Because of the relatively small size of the individual Class members' claims, it is likely that only a few Class members could afford to seek legal redress for Defendants' misconduct.  Further, if individual Class members were required to bring separate actions, this and other courts would be confronted with a multiplicity of lawsuits that would burden the judicial system and risk inconsistent rulings and contradictory judgments.  And, in contrast to the shared and unitary costs of a class action, case-by-case adjudication would greatly magnify the expense and time incurred by the parties and the courts.

115.     Class certification is appropriate because Defendants engaged in a uniform and common practice, and all Class Members have the same legal right to, and interest in, redress for damages associated with violations of the ACA's lactation coverage requirements.

## CLAIMS FOR RELIEF

### COUNT I
**Equitable Relief Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)
for Breach of Fiduciary Duties Under ERISA § 404(a), 29 U.S.C. § 1104(a)
Against Defendants**

116.     Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

117.     Defendants are fiduciaries of the ERISA-governed health care plans in which Plaintiffs and the members of the Class are participants.

118.     Defendants breached their fiduciary duties of prudence under ERISA § 404(a)(1)(B) by, as alleged herein, failing to provide and to administer their health plans in compliance with the preventive services provisions of the ACA with respect to Comprehensive

Lactation Benefits thereby causing Plaintiffs and members of the Class to wrongfully pay for Comprehensive Lactation Benefits and/or to forego Comprehensive Lactation Benefits.

119.    Defendants also breached their duty of loyalty under ERISA § 404(a)(1)(A) by, as alleged herein, failing to provide and to administer their health plans in compliance with the preventive services provisions of the ACA with respect to Comprehensive Lactation Benefits thereby causing Plaintiffs and members of the Class to wrongfully pay for Comprehensive Lactation Benefits and/or to forego Comprehensive Lactation Benefits in order to maximize their profits and cost-shift the ACA preventive service coverage requirement to the Plaintiffs and the members of the Class.

120.    Defendants' breaches of fiduciary duty caused direct injury and losses to Plaintiffs and each member of the Class.

121.    Plaintiffs and the Class seek appropriate equitable relief along with such other and additional relief set forth in the Prayer and/or as may otherwise be available.

<u>**COUNT II**</u>
**Claim for Equitable Relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**for Co-Fiduciary Liability Under ERISA § 405(a), 29 U.S.C. § 1105(a)**
**Against Defendants**

122.    Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

123.    As Defendants are both fiduciaries under ERISA, they are liable under ERISA § 405(a) for each others' violations of ERISA.

124.    Under ERISA § 405(a), 29 U.S.C. § 1105(a), a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with [ERISA § 404(a)(1)] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

ERISA §§ 405(a)(1)-(3), 29 U.S.C. §§ 1105(a)(1)-(3).

125.    Each Defendant knowingly participated in and enabled the other Defendants' breaches of fiduciary duty by allowing Defendants to, as alleged herein, provide and administer health plans that were not in compliance with the preventive services provisions of the ACA with respect to Comprehensive Lactation Benefits thereby causing Plaintiffs and members of the Class to wrongfully pay for Comprehensive Lactation Benefits and/or to forego Comprehensive Lactation Benefits, and by failing to monitor Defendants' compliance with the ACA and plan documents.

126.    Defendants failed to fulfill their ongoing and continuing duty to determine whether the CareFirst health plans were being established and administered in accordance with the ACA, and in the best interests of Plaintiffs and the members of the Class.

127.    Co-fiduciary liability is joint and several under ERISA, and thus Defendants are jointly and severally liable to Plaintiffs and the members of the Class for each of the other's breaches of ERISA's fiduciary responsibility provisions.

## <u>COUNT III</u>
**Discrimination in Violation of Section 1557(a), 42 U.S.C. § 18116(a),<br>of the Patient Protection and Affordable Care Act<br>Against Defendants**

128.    Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

129.    Section 1557(a) of the ACA contains a "nondiscrimination" provision that provides, in relevant part:

> [A]n individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under … title IX … shall apply for purposes of violations of this subsection.

42 U.S.C. § 18116(a).

130.    The ACA nondiscrimination provision specifically prohibits discrimination on the basis of those grounds that are prohibited under other federal laws, including Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX").

131.    Defendants are subject to Section 18116 because Defendants are health programs and activities which are "receiving Federal financial assistance, including credits, subsidies, or contracts of insurance" may not discriminate on the basis of sex.  *See* 42 U.S.C. § 18116(a) (incorporating Title IX by reference), as alleged in ¶¶90-96, *supra.*

132.    Title IX prohibits discrimination on the basis of sex.  Plaintiffs and the members of the Class, who are necessarily all women, are being excluded from participation in, being denied the benefits of, and being subjected to discrimination by Defendants (in Defendants' capacity as insurers and administrators of insurance plans) on the basis of their sex.

133.    Defendants have violated and continue to violate Section 1557(a) of the ACA on the basis of sex discrimination because, as alleged herein, Defendants refuse and otherwise fail to provide parity in coverage for women's preventive services required under the ACA.

134.    Defendants have violated and continue to violate the ACA by discriminating on the basis of sex in Defendants' failure to provide Comprehensive Lactation Benefits as a no-cost preventive service as mandated by the ACA; failure to provide a listing of in-network providers for Comprehensive Lactation Benefits; denial of coverage for Comprehensive Lactation Benefits

secured by purported out-of-network providers in the absence of the availability of in-network providers; imposition of cost and unreasonable administrative burdens intended to deter Plaintiffs and the members of the Class from seeking Comprehensive Lactation Benefits; and placing of other restrictions or limitations on Comprehensive Lactation Benefits, all of which causes widespread detrimental consequences to women.

135.    By violating the women's preventive services requirements under the ACA, Plaintiffs and the members of the Class have been and continue to be denied mandated access to coverage for Comprehensive Lactation Benefits.  Defendants' unlawful conduct in violates the ACA and unjustly enriches Defendants, depriving thousands of women of their ACA- mandated women's preventive services.

136.    If Defendants' unlawful and discriminatory conduct is not foreclosed, many more women will be wrongfully foreclosed from receiving or pay for benefits to which they are entitled under the ACA.

137.    Plaintiffs and members of the Class have been aggrieved and damaged by this violation of Section 1557 of the ACA.

**COUNT V**
**Violation of the Patient Protection and Affordable Care Act**
**through its Incorporation by Reference in CareFirst Plan Documents**
**Against Defendants**

138.    Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

139.    Plaintiffs' and the members of the Class' CareFirst plan documents describe the plan's terms and conditions related to the operation and administration of the CareFirst plans.

140.    CareFirst's plan documents incorporate by reference the ACA and its provisions, including the women's preventive care provisions set forth in 42 U.S.C. § 300gg-13(a)(4), and state that the CareFirst plans comply with the ACA.

141.    Accordingly, as plan participants Plaintiffs have the right to seek to enforce the provisions of the ACA, and in particular, as alleged herein, the provisions of the ACA requiring the provision of Comprehensive Lactation Benefits as a no cost women's preventive service.

142.    As a result of Defendants' failure to provide Comprehensive Lactation Benefits to Plaintiffs and the members of the Class, Plaintiffs and the members of the Class have sustained monetary damages and, if Defendants' conduct is not stopped, continue to be harmed by Defendants' misconduct.

**COUNT VI**
**Unjust Enrichment**
**Against Defendants**

143.    Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

144.    Defendants have been unjustly enriched by the conduct alleged herein, including by (a) withholding money due to Plaintiffs and the members of the Class paid for Comprehensive Lactation Benefits; (b) implementing a course of conduct that prevents women from seeking Comprehensive Lactation Benefits (or makes them pay out-of-pocket), including by their failure to establish a network of providers for Comprehensive Lactation Benefits; and (c) shifting the cost of ACA-mandated no-cost women's preventive services to women.

145.    Although it is part of Defendants' responsibilities and duties to provide and administer health insurance coverage that satisfies the ACA mandated preventive care requirements, including for Comprehensive Lactation Benefits, Defendants have failed to fulfill such responsibilities.

146.    As a result, Plaintiffs and members of the Class conferred an unearned tangible economic benefit upon Defendants by paying out-of-pocket for a preventive service, namely, Comprehensive Lactation Benefits.

147.    Equity militates against Defendants retaining these economic benefits, which should be returned to Plaintiffs and members of the Class.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually, and on behalf of the members of the Class, pray for relief as follows as applicable for the particular cause of action:

A.      An order certifying this action to proceed on behalf of the Class, and appointing Plaintiffs and their counsel to represent the Class;

B.      An order finding that Defendants violated their fiduciary duties to Class Members and awarding Plaintiffs and Class members such relief as the Court deems proper;

C.      An order finding that Defendants violated the preventive services provisions of the ACA, and awarding Plaintiffs and members of the Class such relief as the Court deems proper;

D.      An order finding that Defendants violated the ACA "nondiscrimination" provision, Section 1557(a), 42 U.S.C. § 18116(a), and awarding Plaintiffs and members of the Class such relief as the Court deems proper;

E.      An order finding that Defendants were unjustly enriched and awarding Plaintiffs and members of the Class such relief as the Court deems proper;

F.      Declaratory and injunctive relief as necessary and appropriate, including enjoining Defendants from further violating the duties, responsibilities, and obligations imposed on it by the ACA and ERISA with respect to Comprehensive Lactation Benefits;

G.      An order awarding, declaring or otherwise providing Plaintiffs and members of the Class all relief under ERISA, that the Court deems proper and such appropriate equitable relief as the Court may order, including damages, an accounting, equitable surcharge, surcharge, disgorgement of profits, equitable lien, constructive trust, or other remedy;

H.      An order finding that Defendants are jointly and severally liable as co-fiduciaries in violations of ERISA;

I.      An order awarding Plaintiffs and the members of the Class other appropriate equitable and injunctive relief to the extent permitted by the above claims;

J.      An order awarding Plaintiffs' counsel attorneys' fees, litigation expenses, expert

witness fees and other costs pursuant to ERISA § 502(g)(1), 29 U.S.C. 1132(g)(1), and/or the common fund doctrine; and

K.      Such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand a trial  by jury for all claims asserted in this Complaint so triable.

Dated: October 28, 2016

By:     /s/ Matthew E. Miller
Jonathan W. Cuneo, D.C. Bar No. 939389
Pamela B. Gilbert, D.C. Bar. No. 418207
Matthew E. Miller, D.C. Bar. No. 442857
Katherine Van Dyck, D.C. Bar. No. 981272
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave. NW, Suite 200
Washington, DC 20016
Phone: (202) 789-3960
Fax: (202) 789-1813

Nicholas E. Chimicles (to seek admission *pro hac vice*)
Kimberly Donaldson Smith (to seek admission *pro hac vice*)
Stephanie E. Saunders (to seek admission *pro hac vice*)
**CHIMICLES & TIKELLIS LLP**
361 W. Lancaster Avenue
Haverford, PA 19041
(610) 642-8500
NEC@Chimicles.com
KMD@Chimicles.com
SES@Chimicles.com

*Attorneys for Plaintiffs and the proposed Class*